UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:20-CV-00488-GNS

LONG JOHN SILVER'S, LLC                                                    PLAINTIFF

v.

GKRM, INC., et al.                                                              DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiff's Motion for Default Judgment (DN 15). The matter is ripe for adjudication. For the reasons discussed below, the motion is **GRANTED IN PART**.

### I.        STATEMENT OF FACTS

Plaintiff Long John Silver's, LLC ("LJS"), operates restaurants under the trademark "Long John Silver's" and grants franchise rights to operate restaurants under the same name and trademark. (Compl. ¶ 8, DN 1). LJS owns a distinctive food service system, through which food is sold to the public from LJS restaurants, including: methods and procedures for food preparation and quality control; special ingredients and confidential recipes; a uniform operating method described in the "Long John Silver's Confidential Manual of Operations"; and other communications to franchisees (collectively, the "LJS System"). (Compl. ¶ 9). Similarly, LJS owns and authorizes trademarks, copyrights, trade secrets, and a distinctive public image for use in accordance with the Franchise Agreements (collectively, the "LJS Proprietary Marks"). (Compl. ¶ 9).

LJS alleges that on April 18, 2008, it issued three Franchise Agreements to a Georgia corporation, GK Management, Inc., to operate two restaurants in Georgia and one in South

Carolina.  (Compl. ¶¶ 10, 26, 27; *see also* Compl. Ex.'s A, DN 1-1; Compl. Ex. Q, DN 1-17; Compl. Ex. R, DN 1-18).  Defendant James D. Graves ("Graves") personally guaranteed the performance of each agreement as the corporate Vice-President of GK Management Inc.  (Compl. ¶¶ 10, 26, 27; *see, e.g.*, Compl. Ex. A).  Then on February 7, 2014, LJS issued 15 Franchise Agreements to Defendant, GKRM, Inc. ("GKRM"), a Georgia corporation, to operate 13 restaurants in Georgia and two in California.  (Compl. ¶¶ 11- 24; *see also* Compl. Exs. B to P, DN 1-2 to 1-16).  Graves also personally guaranteed the performance of each agreement as the corporate President of GKRM.[1]  (Compl. ¶¶ 11-24; *see, e.g.*, Compl. Ex. B).  Under the terms of the eighteen Franchise Agreements (collectively the "Franchise Agreements"), the franchisees were granted temporary licenses to use the LJS System and LJS Proprietary Marks in order to operate restaurants as LJS restaurants.  (Compl. ¶ 29).  The franchisees were obligated to submit monthly sales reports and pay royalties and advertising fees to LJS in consideration for the license (collectively the "Franchise Fees").  (Compl. ¶ 30).  The Franchise Agreements also included a noncompete provision that limited the franchisees from owning or operating a restaurant serving similar seafood in a fast-food format within a year after the termination of the Franchise Agreement.  (*See* Compl. ¶ 51).

On September 6, 2015, GKRM entered a so-called "Workout and Settlement Agreement" with LJS ("Settlement Agreement").  (Compl. ¶ 31).  In the Settlement Agreement, GKRM acknowledged it was out of compliance with the Franchise Agreements for failure to pay the Franchise Fees, and other related costs.  (Compl. Ex. S, at 1, DN 1-19).  The Settlement Agreement

---

[1] Documents attached to each Franchise Agreement indicate that Graves is a fifty-percent shareholder of both GK Management, Inc. and GKRM.  (*See, e.g.*, Compl. Ex. A, at 47; Compl. Ex. B at 51).  The other shareholder also guaranteed each agreement but is not a named defendant. (*See, e.g.*, Compl. Ex. A, at 47; Compl. Ex. B, at 51).

states that GKRM, Graves, and LJS agree the Settlement Agreement and all previous Franchise Agreements, including those between GK Management, Inc., constitute a single integrated agreement going forward.  (Compl. Ex. S, at 3).  In the Settlement Agreement, LJS agreed to forego enforcing default remedies against GKRM and Graves in exchange for certain assurances and two promissory notes in favor of LJS: one in the amount of $1,957,503.25 for unpaid royalty and rental fees, and another in the amount of $887,281.36 for unpaid advertising fees (collectively the "Promissory Notes").  (Compl. ¶¶ 31, 33-36; *see also* Compl. Ex. S).  Graves again personally guaranteed the Settlement Agreement and the Promissory Notes.  (Compl. ¶ 36; *see also* Compl. Ex. S).

On May 15, 2019, LJS notified GKRM it was once again in default under certain Franchise Agreements.  (Compl. ¶ 42; *see also* Compl. Ex. T, DN 1-20).  GKRM subsequently failed to cure the defaults, and on November 11, 2019, LJS notified GKRM that a number of Franchise Agreements were terminated, effective immediately.  (Compl. ¶¶ 43-44; *see also* Compl. Ex. U, DN 1-21).  On November 22, 2019, LJS mailed a supplemental letter advising GKRM of a temporary reinstatement.  (Compl. ¶ 45; *see also* Compl. Ex. V, DN 1-22).  On March 23, 2020, LJS mailed a final letter rescinding the temporary reinstatement and terminating all the Franchise Agreements, effective immediately.  (Compl. ¶ 46; *see also* Compl. Ex. W, DN 1-23).  In the letter, LJS emphasized GKRM's contractual obligations upon termination of each Franchise Agreement, including, for example, to cease the use of the LJS System and remove all LJS Proprietary Marks identifying its restaurants as an LJS restaurants (collectively the "Post-Termination Obligations"). (Compl. ¶¶ 47-48). On April 8, 2020 LJS once again demanded payment from Defendants, who did not respond.  (Compl. ¶ 50; *see also* Compl. Ex. X, DN 1-24).  Defendants allegedly have since failed to discontinue the use of all LJS Proprietary Marks, return the LJS Confidential Manual, de-

image the restaurants, or pay Franchise Fees for the period that GKRM has continued to operate the restaurants as LJS restaurants. (Compl. ¶ 52).

LJS sued GKRM and Graves for breach of contract and trademark infringement on July 10, 2020, seeking damages and equitable relief. (Compl. 13-20). GKRM and Graves both failed to answer, and the clerk entered default as to both on November 17, 2020. (Pl.'s Mot. Entry Default, DN 12; Order, DN 13). LJS moved for default judgment on January 22, 2021. (Pl.'s Mot. Default J., DN 15). For the reasons below, LJS's motion is granted in part and denied in part.

## II.   <u>STANDARD OF REVIEW</u>

Pursuant to Rule 55(b), a district court may enter a judgment of default against a defendant who fails to plead or otherwise defend against an action. Fed. R. Civ. P. 55(b). To obtain a judgment by default, the moving party must initially request that the Clerk of the Court enter a default under Fed. R. Civ. P. 55(a). *See Ramada Franchise Sys., Inc. v. Baroda Enters., LLC*, 220 F.R.D. 303, 305 (N.D. Ohio 2004) ("Entry of a default . . . is a prerequisite to entry of a default judgment under Rule 55(b)." (internal citation omitted)). "Once the default has been entered, the well-pleaded facts of the complaint relating to liability must be accepted as true." *O'Neal v. Nationstar Mortg.*, No. 1:07CV505, 2009 WL 1795305, at *3 (S.D. Ohio June 23, 2009) (citation omitted); *see also Malibu Media, LLC v. Schelling*, 31 F. Supp. 3d 910, 911 (E.D. Mich. 2014) ("The entry of default 'conclusively establishes every factual predicate of a claim for relief.'" (citing *Thomas v. Miller*, 489 F.3d 293, 299 (6th Cir. 2007))).

"A default judgment on well-pleaded allegations establishes only defendant's liability; plaintiff must still establish the extent of damages." *Kelley v. Carr*, 567 F. Supp. 831, 841 (W.D. Mich. 1983) (citation omitted). "Even when a default judgment is warranted based on a party's failure to defend, the allegations in the complaint with respect to the amount of damages are not

deemed true.  The district court must instead conduct an inquiry in order to ascertain the amount of damages with reasonable certainty." *Vesligaj v. Peterson*, 331 F. App'x 351, 355 (6th Cir. 2009) (citation omitted).  "It is the plaintiff's burden to establish the amount of damages it is entitled to recover from the party who is in default." *Carl's Jr. Rests. LLC v. Margaret Karcher LeVecke Enters., LLC*, No. 3:18-CV-01357, 2020 WL 836549, at *2 (M.D. Tenn. Feb. 20, 2020) (citation omitted).  Rule 55(b) authorizes the court to "conduct hearings or make referrals" in order "to determine the amount of damages[,] establish the truth of any allegation by evidence[,] or investigate any other matter."  Fed. R. Civ. P. 55(b)(2)(B); *see also Columbia Gas of Ohio, Inc. v. City Elec. Supply Co.*, No. 2:14-CV-294, 2015 WL 6467231, at *2 (S.D. Ohio Oct. 27, 2015). "Although the court may conduct an evidentiary hearing to determine damages, an evidentiary hearing is not a prerequisite to the entry of default judgment if damages are contained in documentary evidence or detailed affidavits and can be ascertained on the record before the court." *Joe Hand Promotions, Inc. v. RPM Mgmt. Co. LLC*, No. 2:11-cv-377, 2011 WL 5389425, at *1 (S.D. Ohio Nov. 7, 2011) (citation omitted).

## III.    DISCUSSION

### A.    Breach of Contract

LJS' claims for breach of contract arise out of the Franchise Agreement and corresponding personal guarantees, and Settlement Agreements and accompanying Promissory Notes.  "To prove a breach of contract, the complainant must establish three things:  1) existence of a contract; 2) breach of that contract; and 3) damages flowing from the breach of contract." *Rouse v. Farmer*, No. 2015-CA-001626-MR, 2018 WL 2078030, at *4 (Ky. App. May 4, 2018) (citation omitted). The Complaint adequately pleads this claim.

5

LJS contends GKRM failed to pay numerous Franchise Fees and other costs under the Franchise Agreements.  Sections 11.01(c)(2) and 11.01(d) of the Franchise Agreements state that if the franchisee fails to pay any amount when due, the franchisee has ten days to cure the event of default once written notice is provided.  (Compl. ¶ 38; *see, e.g.*, Compl. Ex. A, at 26).  LJS alleged it provided notice of default to GKRM on May 15, 2019, and has performed all material obligations under the Franchise Agreements and Settlement Agreement.  In addition, LJS alleges GKRM has failed to comply with the Post-Termination Obligations.  Pursuant to Sections 11.02(b)-(c) of the Franchise Agreements, upon termination of the agreement, GKRM is required immediately to cease doing business as LJS restaurants or operate under any name that might tend to give the public the impression it was or is a franchisee, to discontinue the use of the LJS System and LJS Proprietary Marks, to return to LJS the LJS Confidential Manual and other manuals, and promptly to de-image any restaurant from its appearance as an LJS restaurant by removing all LJS Proprietary Marks and painting the business and property.  (Compl. ¶ 47; *see, e.g.*, Compl. Ex. A, at 25-26).  LJS also alleged that Graves failed to perform all GKRM's duties and obligations under the Franchise Agreements and Settlement Agreement, in violation of his personal guarantees and the Promissory Notes.

Furthermore, Section 2(a) of the Settlement Agreement provides:

> As a condition precedent to LJS's execution and performance under this Agreement, Franchisee and Guarantors shall remain current and pay all fees for each period hereafter, including, but not limited to, royalty, advertising, rent, taxes, and any other fees, due and owing to LJS under the Franchise Agreement, beginning with all payments relating to the period ending January 23, 2016, and due 20 days thereafter per the Franchise Agreements.

(Compl. Ex. S, at 1).  Section 10(f) of the Settlement Agreement states that "[i]n the event that Franchisee fails to timely or fully perform any of the condition or obligations under the Agreement, then the Franchise Agreements may be terminated without further act by or notice from LJS and

LJS shall have available to it all additional remedies available under applicable law."  (Compl. Ex. S, at 4).   Section 4 of the Settlement Agreement also includes a cross-default provision: "Guarantors and Franchisee agree that an event of default under this Agreement, or any of the Obligations shall constitute an event of default under each and every one of the foregoing agreements."  (Compl. Ex. S, at 2).  Section C of the Promissory Notes similarly defines an event of default as "[d]efault under or nonperformance by Maker or the Guarantors under the Settlement Agreement or any agreement referenced in the Settlement Agreement."  (Compl. ¶ 39).

Accepting as true the well-pleaded factual allegations in the Complaint, LJS has alleged facts that support its claims for breach of contract under the Franchise Agreements and corresponding personal guarantees, and the Settlement Agreement and accompanying Promissory Notes, for which a default judgment should enter.  *See, e.g.*, *Little Caesar Enters., Inc. v. Reyes 1, Inc.*, No. 19-CV-11437, 2020 WL 2395206, at *4 (E.D. Mich. May 11, 2020) ("Accordingly, [the] Court will enter judgment in Plaintiffs' favor, declaring that Defendants' conduct violated the terms of the Settlement and Franchise Agreements.").

## B.    Declaratory Relief

LJS also seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 that the Franchise Agreements were terminated March 23, 2020, and that GKRM and Graves "(1) are not authorized to continue to use LJS Marks and to operate an LJS restaurant, and (2) must comply with all terms of the Franchise Agreements, including payment of amounts due and owing under the Franchise Agreements and performance of all Post-Termination Obligations under the Franchise Agreements."  (Compl. ¶ 89-90; (Pl.'s Mem. Supp. Mot. Default J. 5, DN 11-1).  LJS alleged that "[d]espite the termination on March 23, 2020 and the demand by LJS to cease and desist their unauthorized operation, the Defendants continue to use and display, without a License or valid

7

Franchise Agreement, the LJS Proprietary Marks at the restaurants." (Compl. ¶ 55). Similarly, Defendants have allegedly failed to pay all fees for the period of time that GKRM has continued to own and operate the restaurants as LJS restaurants since the Franchise Agreements were terminated. (Compl. ¶ 52).

Although the declaratory judgment addresses similar allegations as the breach of contract claim, LJS alleges that Defendants continue to withhold Franchise Fees and have still failed to comply with the Post-Termination obligations since March 23, 2020, when the Franchise Agreements were terminated. *See ICENY USA, LLC v. M&M'S, LLC*, No. CV TDC-19-2418, 2020 WL 1890511, at *3 (D. Md. Apr. 16, 2020) ("In Counts 1 and 2, ICENY seeks a declaratory judgment that the Franchise Agreement terminated on June 28, 2019, and that the Mutual Termination and Release Agreement purportedly signed by Naruenartwanich was never executed by ICENY and is thus unenforceable. In light of the Defendants' default, and for the reasons already stated . . . , the Court finds that ICENY is entitled to a declaratory judgment as to these counts."). Accordingly, LJS' motion for declaratory judgment is granted.

### C.   Lanham Act

LJS argues GKRM has violated Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1) by continuing to use and display the LJS Proprietary Marks. (Compl. 16). To establish liability for trademark infringement under 15 U.S.C. § 1114(a), a party must show: "(1) that it owns a trademark, (2) that the infringer used the mark in commerce without authorization, and (3) that the use of the alleged infringing trademark 'is likely to cause confusion among consumers regarding the origin of the goods offered by the parties.'" *Coach, Inc. v. Goodfellow*, 717 F.3d 498, 502 (6th Cir. 2013) (citations omitted). The likelihood of confusion is the essence of the claims. *See Audi*

*AG v. D'Amato*, 469 F.3d 534, 542 (6th Cir. 2006).  The Complaint adequately pleads LJS' claim for trademark infringement under the Lanham Act.

LJS owns the rights to its trademark marks, principally "Long John Silver's", used alone and in conjunction with other words and designs.  LJS also uses distinctive and characteristic trademarks, trade dress, and service marks, including "Long John Silver's" signs, designs, and emblems as LJS designates in the LJS Confidential Manual or otherwise in writing as prescribed for use with the LJS System.[2]  (Compl. ¶ 76).  LJS alleges GKRM has continued to make use of LJS Proprietary Marks after the termination of the Franchise Agreements.  Ultimately, "[t]he Defendants are using the LJS Proprietary Marks without a License by or authority of LJS." (Compl. ¶ 83).  "It is well settled that in cases where, as here, the infringer is a holdover franchisee, the 'unauthorized use of an original trademark by one whose license to use the trademark had been terminated is sufficient to establish 'likelihood of confusion.'"  *Carl's Jr. Rests. LLC*, 2020 WL 836549, at *3 (citing *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1190 (6th Cir. 1997)).  Accepting as true the well-pleaded factual allegations in the Complaint, LJS has alleged facts supporting its claims for trademark infringement, for which a default judgment should enter.

### D.    <u>Injunctive Relief</u>

LJS seeks a permanent injunction pursuant to both the Franchise and Settlement Agreements, and 15 U.S.C. § 1116, restraining Defendants, its agents, servants, employees, successors, related companies, and assigns from directly or indirectly:

> (a)    Doing business as an LJS Restaurant or operating under any name or in any manner that might tend to give the public the impression that are or were an LJS Franchisee or otherwise associated with the Company;
> (b)    Using the LJS System and the LJS Proprietary Marks, LJS name, symbol, or indicia, doing any other act, or making any statement which suggests or

---

[2] The Complaint states that a nonexclusive list of LJS Proprietary Marks is attached as Exhibit G, but Exhibit G is a Franchise Agreement.  (Compl. ¶ 76).

indicates that Defendants are in any way affiliated, connected, or associated with the LJS System, are an authorized LJS franchisee, or which is likely to cause confusion or mistake or to deceive in connection with the advertising, promotion and selling of goods and services at Defendants' restaurant operated under the Franchise Agreement;

(c)     Using any proprietary information or other trade secrets disclosed to them or using goods, emblems, signs, displays or other property on which the LJS name, any of the LJS Proprietary Marks or any confusing assimilation thereof are imprinted . . . .

(Pl.'s Mem. Supp. Mot. Default J. 5-6).  LJS similarly seeks a permanent injunction requiring

Defendants:

(d)     . . . immediately de-image the restaurant from its present appearance, to remove all signs, emblems, displays or other items associated with LJS, the LJS System, and the LJS Proprietary Marks, to return all copies of the LJS Confidential Manual, and to de-identify or modify the exterior of the restaurant building as to differentiate it from its prior identity as an LJS restaurant; . . .

(e)     . . . comply with the non-compete provision of their Franchise Agreements[; and]

(f)     . . . file with the Court and serve on Plaintiff's counsel within thirty (30) days after service of any injunction issued herein or within such reasonable time as the Court shall direct, a report in writing and under oath setting forth in detail the manner in which Defendants have complied with such injunction . . . .

(Pl.'s Mem. Supp. Mot. Default J. 6).

A plaintiff who seeks a permanent injunction must demonstrate:  (1) it has suffered irreparable injury; (2) there is no adequate remedy at law; (3) that considering the hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that it is in the public's interest to issue such an injunction.  *Audi AG*, 469 F.3d at 549-50. "In the case of a default judgment, the court need not hold an evidentiary hearing to grant a permanent injunction, because there are no factual issues in dispute." *I Love Juice Bar Franchising, LLC v. ILJB Charlotte Juice, LLC*, No. 3:19-CV-00981, 2020 WL 4735031, at *5 (M.D. Tenn. Aug. 14, 2020) (citations omitted).

Regarding LJS' trademark claim, the Lanham Act permits permanent injunctions to prevent future violations of the Act. *See* 15 U.S.C. § 1116. "[T]he law of this Circuit holds that no particular finding of likelihood of . . . irreparable harm is necessary for injunctive relief in trademark infringement or unfair competition cases." *Am. Auto. Ass'n v. Dickerson*, 995 F. Supp. 2d 753, 757-58 (E.D. Mich. 2014) (quoting *Circuit City Stores, Inc. v. CarMax, Inc.*, 165 F.3d 1047, 1056 (6th Cir. 1999)). Irreparable injury "ordinarily follows when a likelihood of confusion or possible risk to reputation appears" from infringement. *Id.* (citation omitted). A sister court recently addressed an identical circumstance in the context of a default judgment:

> In the present case, the Court finds that Plaintiff has suffered an irreparable injury: there is a likelihood of confusion. Regarding the second factor, Plaintiff has asserted facts in its Complaint sufficient to show that Defendants' unlawful continued use of Plaintiff's Marks is causing and will continue to cause irreparable harm and that there is no adequate remedy at law. See Audi, 469 F.3d at 550. Further, as to the third factor, the Court finds that a permanent injunction would cause no harm to Defendants, as it would merely require them to comply with federal law. Without a permanent injunction, Plaintiff faces hardship from consumer confusion and possible loss of reputation. Finally, preventing consumer confusion is in the public's interest.

*Carl's Jr. Rests. LLC*, 2020 WL 836549, at *4 (internal citation omitted). For the same reasons, LJS is entitled to a permanent injunction enjoining any further use of the LJS Proprietary Marks in violation of the Lanham Act.

Similarly, LJS is entitled to a permanent injunction enforcing the Franchise Agreements' non-compete provision.[3] Another sister court recently addressed this precise issue:

---

[3] The non-compete provision is reasonable under Kentucky law applicable to the Franchise Agreements. (*See, e.g.*, Compl. Ex. A, at 36 ("This Agreement . . . shall be governed and construed under and in accordance with the laws of the Commonwealth of Kentucky, which law shall prevail in the event of any conflict of law.")). The non-compete term in the Franchise Agreements provides:

> For a period of one (1) year after the expiration or termination of this Agreement, regardless of the cause of termination, Franchisee and its Owners shall not, except

Plaintiff has shown that it will suffer irreparable harm if Defendants are not permanently enjoined from operating a "Competing Business," defined by the Franchise Agreements as "any Store serving as its primary menu offering freshly made to order fruit and vegetable juices or smoothies[.]" . . . Nor do [Defendants] face hardship in complying with their obligations under the Franchise Agreements. . . . Finally, since Defendants apparently continue to operate in defiance of their ongoing obligations under the terminated Franchise Agreements, it is in the public interest to grant such an injunction to enforce federal trademark laws and to prevent consumers from being misled regarding the source and origin of products purchased from Defendants. . . . The Court has little difficulty finding that these factors collectively weigh in favor of ordering the injunctive relief to prevent Defendants from continuing to violate 15 U.S.C. § 1125(a) with respect to the "I Love Juice Bar" trademark and trade names and from continuing to operate a "Competing Business" in defiance of the terminated Franchise Agreement.

*I Love Juice Bar Franchising, LLC*, 2020 WL 4735031, at *6-7 (first alteration in original) (internal citations omitted); *see also Domino's Pizza Franchising, LLC v. VTM Pizza, Inc.*, No. 15-CV-13312, 2015 WL 9500791 (E.D. Mich. Dec. 31, 2015) (granting motion for default judgment and enjoining defendants from operating any carry-out or delivery pizza store at the business at the former Domino's Pizza location); *Little Caesar Enters., Inc.*, 2020 WL 2395206, at *4 (requiring defendants fully comply with the post-termination obligations, including defendants' obligation to de-identify their restaurants). Accordingly, LJS' motion for a permanent injunction is granted to the extent requested in its Motion for Default Judgment.

---

as otherwise approved in writing by the Company, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person, persons, partnership or corporation, own, maintain, engage in, or have any interest in any restaurant or business engaged in food service, which is located within one and one-half (1 1/2) miles of the Franchised Restaurant, if (1) the gross sales of seafood of the restaurant or business constitute or are likely to constitute twenty percent (20%) or more of all sales of the restaurant or business, or (2) the restaurant sells any battered seafood product in a quick service or "fast food" format.

(*See, e.g.*, Compl. A, at 30). "Kentucky courts have found narrowly drawn covenants to be reasonable." *Church Mut. Ins. Co. v. Smith*, No. 3:14CV-749-H, 2014 WL 12866056, at *6 (W.D. Ky. Nov. 24, 2014). "Similarly, Kentucky Courts have found time spans between one and five years to be reasonable." *Id.* Accordingly, the provision here is reasonable in scope, time, and geographic region.

12

E.    **Damages**

For breaching the Franchise and Settlement Agreements, LJS' motion requests monetary

damages as follows:

> (4)    Judgment against Defendants jointly and severally and in favor of LJS on
> its claims for payment due and owing under the LJS Contracts, including without
> limitation, all interest charges, plus such amounts as accrue until judgment, costs,
> attorneys' fees, and expenses, for the total amount of $4,162,387.15, comprised of
> the following:
>      (a)    $4,154,576.75 for the Post Workout and Settlement Arrearage and
> the Workout and Settlement Agreement Financial Obligations plus accrued
> interest;
>      (b)    Late payment charge at the rate of 1 1/2% per month for unpaid
> royalties and advertising payments;
>      (c)    LJS's reasonable attorneys' fees, court costs and all of LJS's
> expenses in connection with this action in the amount of $7,810.40;
>      (d)    Liquidated damages for the Franchisee's failure to de image the
> restaurants and comply with all Post-Termination Obligations pursuant to
> Paragraph 11.04 of the Franchise Agreements.
> [5]    Pre- and post- judgment interest at the statutory rate until the awarded
> damages are paid.

(Pl.'s Mem. Supp. Mot. Default J. 6-7).  The total amount "for the Post Workout and Settlement

Arrearage and the Workout and Settlement Agreement Financial Obligations plus accrued interest"

consists of the Promissory Notes under the Settlement Agreement ($1,957,503.25 + $887,281.36

= $2,844,784.61) and arrearages following the Settlement Agreement for unpaid royalty,

advertising, rent, and other fees under certain Franchise Agreement totaling $1,309,792.14

($2,844,784.61 + $1,309,792.12 = $4,154,576.75).  (*See* Compl. Ex. X, at 1).

LJS has provided sufficient evidence to support "with reasonable certainty" the damages

claimed under the Promissory Notes.  *See Vesligaj*, 331 F. App'x at 355 (citation omitted).  LJS

has attached the Promissory Notes, and accompany guarantees signed by Graves, alongside the

Franchise and Settlement Agreements.  Regarding the Post-Settlement-Agreement arrearages,

however, LJS only included the Demand Letter sent to GKRM as evidence for the amounts due.

13

(*See* Compl. Ex. X, at 4-6).  The Demand Letter merely provided a chart with invoice dates and amounts for Franchise Fees and other related costs.  (*See* Compl. Ex. X, at 4-6).  But LJS "has not filed affidavits or any other supporting evidence showing or explaining how each of those specified amounts were calculated."  *Carl's Jr. Rests. LLC*, 2020 WL 836549, at *5.  Accordingly, to the extent LJS seeks damages resulting from arrearages, late payment charges, and liquidated damages,[4] the Court will not grant these damages at this juncture.  Instead LJS must file evidentiary

---

[4] The liquidated damages provision is enforceable under Kentucky law. The liquidated damages provision states:

> For avoidance of doubt, Liquidated Damages shall be paid solely in lieu of any consequential damages for lost royalty income, advertising fees or lost profits arising from Franchisee's failure to operate or Franchisee's abandonment of the Franchised Restaurant, and not in lieu of the Company's actual damages for Franchisee's failure to pay royalties or advertising fees based on actual Gross Receipts, trademark infringement, deidentification costs or other similar actual damages.  Liquidated Damages shall be an amount equal to the Restaurant's Gross Receipts for the twelve (12) month period immediately preceding the termination or breach multiplied by a factor equal to two (2) times the royalty rate set forth in Section 6 [Initial and Royalty Fees].  If, at the time of termination or breach, there are less than two (2) years remaining in the term of this Agreement, the Liquidated Damages amount shall be reduced by the ratio that the amount of time remaining in the term bears to two (2) years.  In the event that the Franchisee has not reported Gross Receipts for any portion of that twelve (12) month period, the Franchisee agrees that the Company may estimate such unreported Gross Receipts based upon such data as is reasonably available to it at the time.

(*See, e.g.*, Compl. Ex. A, at 29).  "A provision providing for liquidated damages will be upheld so long as it is actually liquidated damages and not a penalty provision."  *Am. Dairy Queen Corp. v. Fortune Street Rsch. & Writing Inc.*, 753 F. Supp. 2d 675, 681 (W.D. Ky. 2010) (citation omitted).  "Where, at the time of the execution of the contract, damages may be uncertain in character or amount, or difficult to reasonably ascertain, a provision for liquidated damages will be enforced, provided the amount agreed upon is not greatly disproportionate to the injury which might result."  *United Serv. Auto. Assoc. v. ADT Sec. Serv., Inc.*, 241 S.W.3d 335, 340-41 (Ky. App. 2006) (citations omitted).  In the Franchise Agreements, the parties explicitly

> acknowledge[d] and agree[d] that the precise amount of the Company's consequential damages for lost royalty income, advertising fees or lost profits as a result of the termination or breach of this Agreement would be difficult to ascertain and that the Liquidated Damages represent a reasonable estimate of such damages,

support for claimed damages within 30 days of the entry of this Memorandum Opinion and Order. The Court will then enter a final order based on any support provided by LJS' support for these claimed damages.

As to the attorneys' fees, LJS' counsel requests $ 7,810.40.  (Pl.'s Mem. Supp. Mot. Default J. 7).  The Franchise Agreements provides:

> Franchisee, upon any termination or expiration of this Agreement, shall promptly pay to the Company, its affiliates and subsidiaries any and all sums owed to them. In the event of termination for any default by Franchisee, such sums shall, subject to Section 11.04 below, include all actual and consequential damages, costs and expenses, including reasonable attorneys' fees and expenses, incurred by the Company as a result of the default (whether such fees and expenses are incurred through use of the Company's own legal staff or otherwise) . . . .

(*See, e.g.*, Compl. Ex. A, at 26).  According to the Court's ruling above, LJS has incurred attorneys' fees and costs as a result of Defendants' default.  Plaintiff's counsel has submitted an affidavit and invoices providing the Court with a detailed accounting of hours billed and litigation fees.  (Pl.'s Mot. Default J. Ex. 2, DN 15-2).  The Court, having reviewed the evidence, finds the amounts and time billed to be reasonable.  Accordingly, LJS will be awarded attorney's fees and costs in the amount of $7,810.40.

## IV.   <u>CONCLUSION</u>

For the reasons discussed above, **IT IS HEREBY ORDERED** that Plaintiff's Motion for Default Judgment (DN 15) is **GRANTED IN PART**.  **IT IS FURTHER ORDERED** that:

---

> based upon Franchisee's historical level of Gross Receipts and the approximate time it would take the Company to solicit and grant a franchise for a replacement LJS Restaurant in the vicinity.

(Compl. Ex. A, at 29).  Although the provision is enforceable, it is based on the same evidence which is lacking in support of the arrearages, and thus must be ascertained with evidentiary support.

(1)	The Franchise Agreements have been terminated effective March 23, 2020, due to the Franchisee's defaults under the terms set forth in the Franchise Agreements and other LJS Contracts.

(2)	Pursuant to 28 U.S.C. § 2201, Defendants: (1) are not authorized to continue to use the LJS Proprietary Marks and to operate the restaurant as an LJS Restaurant, and (2) must comply with all terms of the Franchise Agreements including payment of all amounts due and owing under the LJS Contracts and performance of all Post-Termination Obligations.

(3)	Pursuant to 15 U.S.C. § 1116, the Defendants, agents, servants, employees, successors, related companies and assigns are enjoined and restrained from directly or indirectly:

(a)	Doing business as an LJS Restaurant or operating under any name or in any manner that might tend to give the public the impression that are or were an LJS Franchisee or otherwise associated with the Company;

(b)	Using the LJS System and the LJS Proprietary Marks, LJS name, symbol, or indicia, doing any other act, or making any statement which suggests or indicates that Defendants are in any way affiliated, connected, or associated with the LJS System, are an authorized LJS franchisee, or which is likely to cause confusion or mistake or to deceive in connection with the advertising, promotion and selling of goods and services at Defendants' restaurant operated under the Franchise Agreement;

(c)	Using any proprietary information or other trade secrets disclosed to them or using goods, emblems, signs, displays or other property on which the LJS name, any of the LJS Proprietary Marks or any confusing assimilation thereof are imprinted;

(4)	Furthermore, Defendants must immediately de-image the restaurant from its present appearance, to remove all signs, emblems, displays or other items associated with LJS, the

16

LJS System, and the LJS Proprietary Marks, to return all copies of the LJS Confidential Manual, and to de-identify or modify the exterior of the restaurant building as to differentiate it from its prior identity as an LJS restaurant; comply with the non-compete provision of their Franchise Agreements; and file with the Court and serve on Plaintiff's counsel within thirty (30) days after service of the injunction issued, a report in writing and under oath setting forth in detail the manner in which Defendants have complied with such injunction.

(5)     Defendants, jointly and severally, are liable on Plaintiff's claim for payment due and owing under the Franchise Agreement, Settlement Agreement, and Promissory Notes, for all interest charges, plus such amounts as accrue until judgment, costs, attorneys' fees, and expenses for at least $2,844,784.61, comprising the amount secured by the Promissory Notes, and $7,810.40, for attorneys' fees.  Plaintiff may file evidentiary support for its damages' claim in excess of this amount, as defined in the Court's Memorandum Opinion and Order, within **30 days**.

Greg N. Stivers, Chief Judge

United States District Court

August 31, 2021

cc:     counsel of record